

# EXHIBIT 1

## AFFIDAVIT OF SPECIAL AGENT COLLEEN FORGETTA

I, Colleen Forgetta, being duly sworn, depose and state:

1.   I am a Special Agent with the Department of Homeland
Security, Bureau of Immigration and Customs Enforcement (ICE),
assigned to the Special Agent in Charge in Boston.  I have been a
Special Agent for 20 years.  As part of my duties, I am currently
assigned to investigate criminal violations relating to child
exploitation and child pornography including violations
pertaining to the illegal production, distribution, receipt and
possession of child pornography, in violation of 18 U.S.C. §§
2252 and 2252A.  I attended the Immigration and Customs Special
Agent Cross Training Course at the Federal Law Enforcement
Training Center which included a segment on Cybercrimes and Child
Pornography, and have had the opportunity to observe and review
numerous examples of child pornography (as defined in 18 U.S.C. §
2256)[1] in all forms of media including computer media.  I have

---

[1] "Child Pornography means any visual depiction, including
any photograph, film, video, picture, or computer or computer-
generated image or picture, whether made or produced by
electronic, mechanical, or other means, of sexually explicit
conduct, where – (A) the production of such visual depiction
involves the use of a minor engaging in sexually explicit
conduct; . . . [or] (C) such visual depiction has been created,
adapted, or modified to appear that an identifiable minor is
engaging in sexually explicit conduct."  For conduct occurring
after April 30, 2003, the definition also includes "(B) such
visual depiction is a digital image, computer image, or computer-
generated image that is, or is indistinguishable from that of a
minor engaging in sexually explicit conduct."  18 U.S.C. §
2256(8).

also participated in the execution of approximately 100 search warrants involving various criminal offenses.

2.    This Affidavit is made in support of an application for a warrant to search the residence of Darren Wilder, located at 5 Valley Road, Dracut, Massachusetts 01826 (the "SUBJECT PREMISES") and a warrant for a 2004 Ford Pickup Truck bearing license plate number MA 50651 registered to Darren Wilder (the "SUBJECT VEHICLE"). The SUBJECT PREMISES to be searched is more specifically described as a single story, single family residence with an attached garage located on a corner piece of property at the intersection of Valley Road and Broad Road. The SUBJECT VEHICLE is more specifically described as orange and black in color.

3.    The purpose of this application is to seize evidence of violations of 18 U.S.C. §§ 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to possess child pornography, and violations of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(2), which make it a crime to receive child pornography in interstate commerce and §§ 2252(a)(1) and 2252A(a)(1), which make it a crime to transport or ship child pornography in interstate commerce.

4.    I am familiar with the information contained in this Affidavit based upon the investigation I have conducted and based on my conversations with other law enforcement officers who have engaged in numerous investigations involving child pornography.

5. Because this Affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence of violations of 18 U.S.C. §§ 2252 and 2252A are located at the SUBJECT PREMISES and SUBJECT VEHICLE and within a computer and related peripherals, and computer media found at the SUBJECT PREMISES and in the SUBJECT VEHICLE. Where statements of others are set forth in this Affidavit, they are set forth in substance and in part.

6. As a result of the instant investigation described more fully below, there is probable cause to believe that evidence and fruits of violations of federal law, including 18 U.S.C. §§ 2252 and 2252A, as well as property used in committing a crime, as specifically described in Schedule A attached hereto, are currently present at the SUBJECT PREMISES and in the SUBJECT VEHICLE.

7. The instant investigation has revealed that an individual employing the e-mail address vzelkk2n@verizon.net, subsequently identified as Darren Wilder purchased a subscription to a website that was distributing child pornography, and that there is probable cause to believe that evidence of a various child pornography crimes will be located at the SUBJECT PREMISES and in the SUBJECT VEHICLE. Paragraphs 8 and 9 explain technical terms

3

and concepts related to computers.  Paragraphs 10 and 11 explain

how computers and computer technology have revolutionized the way

in which child pornography is produced, utilized and distributed.

The information set forth in paragraphs 12 through 27 provide

background concerning the underlying investigation through which

the lead to Darren Wilder and the SUBJECT PREMISES was developed.

They also provide a general overview of how subscriptions to

particular websites offering child pornography were linked to

individual purchasers, including Darren Wilder.  Finally,

paragraphs 28 through 48 describe, more particularly, the

investigation of Darren Wilder and the SUBJECT PREMISES and

SUBJECT VEHICLE.

### The Internet and Definitions of Technical Terms Pertaining to Computers

8.   As part of my training and experience as well as discussions

with law enforcement officers with experience in cases involving

computer use, I have become familiar with the Internet (also

commonly known as the World Wide Web or the Net), which is a

global network of computers[2] and other electronic devices that

communicate with each other using various means, including

---

[2]   **Computer:** The term "computer" is defined by 18 U.S.C. §
1030(e)(1) to mean "an electronic, magnetic, optical,
electrochemical, or other high speed data processing device
performing logical, arithmetic, or storage functions, and
includes any data storage facility or communications facility
directly related to or operating in conjunction with such device,
but such term does not include an automated typewriter or
typesetter, a portable hand held calculator, or other similar
device."

4

computer that provides resources for other computers on the Internet is known as a server.  Servers are known by the types of service they provide, that is how they are configured.  For example, a web server is a machine that is configured to provide web pages to other computers requesting them.  An e-mail server is a computer that is configured to send and receive electronic mail from other computers on the internet. A client computer is a computer on the Internet that is configured to request information from a server configured to perform a particular function.  For example, if a computer is configured to browse web pages and has web page browsing software installed, it is considered a web client.

b.  **Computer system and related peripherals, and computer media**: As used in this affidavit, the terms "computer system and related peripherals, and computer media" refer to tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drives and other computer-related operation

6

equipment, digital cameras, scanners, in addition to computer photographs, Graphic Interchange formats and/or photographs, and other visual depictions of such Graphic Interchange formats, including, but not limited to, JPG, GIF, TIF, AVI, and MPEG.

c. **Domain Name:** Domain names are common, easy to remember names associated with an Internet Protocol ("IP") address (defined below). For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first level, or top-level domains are typically .com for commercial organizations, .gov for the United States government, .org for organizations, and, .edu for educational organizations. Second level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the world wide web server located at the United States Department of Justice,

which is part of the United States government.

d.   **Internet Service Providers (ISPs) and the Storage of ISP Records**: Internet Service Providers ("ISPs") are commercial organizations that are in business to provide individuals and businesses access to the internet.  ISPs provide a range of functions for their customers including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment.  ISPs can offer a range of options in providing access to the Internet including telephone based dial-up, broadband based access via digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription.  ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, that the connection supports.  Many ISPs assign each subscriber an account name – a user name or screen name, an "e-mail address," an e-mail mailbox, and a personal password selected by the subscriber.  By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and personal password.  ISPs maintain records

("ISP records") pertaining to their subscribers
(regardless of whether those subscribers are
individuals or entities). These records may include
account application information, subscriber and billing
information, account access information (often times in
the form of log files), e-mail communications,
information concerning content uploaded and/or stored
on or via the ISP's servers, and other information,
which may be stored both in computer data format and in
written or printed record format. ISPs reserve and/or
maintain computer disk storage space on their computer
system for their subscribers' use. This service by
ISPs allows for both temporary and long-term storage of
electronic communications and many other types of
electronic data and files. Typically, e-mail that has
not been opened by an ISP customer is stored
temporarily by an ISP incident to the transmission of
that e-mail to the intended recipient, usually within
an area known as the home directory. Such temporary,
incidental storage is defined by statute as "electronic
storage," see 18 U.S.C. § 2510(17), and the provider of
such a service is an "electronic communications
service." An "electronic communications service," as
defined by statute, is "any service which provides to

users thereof the ability to send or receive wire or electronic communications.  18 U.S.C. § 2510(15).  A service provider that is available to the public and provides storage facilities after an electronic communication has been transmitted and opened by the recipient, or provides other long term storage services to the public for electronic data and files, is defined by statute as providing a "remote computing service." 18 U.S.C. § 2711(2).

e.  **Internet Protocol Address**: Every computer or device on the Internet is referenced by a unique IP address the same way every telephone has a unique telephone number. An IP address is a series of four numbers separated by a period, and each number is a whole number between 0 and 254.  An example of an IP address is 192.168.10.102.  Each time an individual accesses the Internet, the computer from which that individual initiates access is assigned an IP address.  A central authority provides each ISP a limited block of IP addresses for use by that ISP's customers or subscribers.  Most ISP's employ dynamic IP addressing, that is they allocate any unused IP address at the time of initiation of an Internet session each time a customer or subscriber accesses the Internet.  A

10

dynamic IP address is reserved by an ISP to be shared among a group of computers over a period of time. The ISP logs the date, time and duration of the Internet session for each IP address and can identify the user of that IP address for such a session from these records. Typically, users who sporadically access the Internet via a dial-up modem will be assigned an IP address from a pool of IP addresses for the duration of each dial-up session. Once the session ends, the IP address is available for the next dial-up customer. On the other hand, some ISP's, including most cable providers, employ static IP addressing, that is a customer or subscriber's computer is assigned one IP address that is used to identify each and every Internet session initiated through that computer. In other words, a static IP address is an IP address that does not change over a period of time and is typically assigned to a specific computer.

f.    **Log File:** Log files are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they

contain.  For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

g.   **Modem:** A modem is an electronic device that allows one computer to communicate with another.

h.   **Trace Route:** A trace route is an Internet debugging tool used to document the list of inter-connected computers between two computers on the Internet.  A trace route will list the names and IP addresses of computers that provide the physical link between two computers on the Internet.  Trace routes are useful tools to help geographically identify where a computer on the Internet is physically located, and usually includes information about the registered owner of computers on the Internet.

i.   **Website:** A website consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from the web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

j.   **Website Hosting**: Website hosting provides the equipment and services required to host and maintain files for one or more websites and to provide rapid Internet connections to those websites. Most hosting is "shared," which means that multiple websites of unrelated companies are on the same server in order to reduce associated costs. When a client develops a website, the client needs a server and perhaps a web hosting company to host it. "Dedicated hosting" means that the web hosting company provides all of the equipment and assumes all of the responsibility for technical support and maintenance of a website. "Co-location" means a server is located at a dedicated hosting facility designed with special resources, such as a secure cage, regulated power, a dedicated Internet connection, online security and online technical support. Co-location facilities offer customers a secure place to physically house their hardware and equipment as opposed to keeping it in their offices or warehouse, where the potential for fire, theft or vandalism is greater.

**Computers and Child Pornography**

10.  Based upon my knowledge, training, and experience and the experience and training of other law enforcement officers with

whom I have had discussions, computers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized. Prior to the advent of computers and the Internet, child pornography was produced using cameras and film, resulting in either still photographs or movies. The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. As a result, there were definable costs involved with the production of pornographic images. To distribute these images on any scale also required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of these wares was accomplished through a combination of personal contacts, mailings, and telephone calls, and compensation for these wares would follow the same paths. More recently, through the use of computers and the Internet, distributors of child pornography have used membership-based/subscription-based websites to conduct business, allowing them to remain relatively anonymous.

11. In addition, based upon my own knowledge, training, and experience in child exploitation and child pornography investigations, and the experience and training of other law enforcement officers with whom I have had discussions, the development of computers has also revolutionized the way in which

14

child pornography collectors interact with, and sexually exploit,

children. Computers serve four basic functions in connection

with child pornography: production, communication, distribution,

and storage. More specifically, the development of computers has

changed the methods used by child pornography collectors in these

ways:

> a.   Producers of child pornography can now
> produce both still and moving images directly
> from a common video or digital camera.  The
> camera is attached, using a device such as a
> cable, or digital images are often uploaded
> from the camera's memory card, directly to the
> computer.  Images can then be stored,
> manipulated, transferred, or printed directly
> from the computer.  Images can be edited in
> ways similar to how a photograph may be
> altered.  Images can be lightened, darkened,
> cropped, or otherwise manipulated.  The
> producers of child pornography can also use a
> device known as a scanner to transfer
> photographs into a computer-readable format.
> As a result of this technology, it is
> relatively inexpensive and technically easy to
> produce, store, and distribute child
> pornography.  In addition, there is an added
> benefit to the pornographer in that this method
> of production does not leave as large a trail
> for law enforcement to follow.
>
> b.   The Internet allows any computer to
> connect to another computer.  By connecting to
> a host computer, electronic contact can be made
> to literally millions of computers around the
> world.  A host computer is one that is attached
> to a network and serves many users.  Host
> computers are sometimes operated by commercial
> ISPs, such as America Online ("AOL") and
> Microsoft, which allow subscribers to dial a
> local number and connect to a network which is,
> in turn, connected to the host systems.  Host
> computers, including ISPs, allow e-mail service
> between subscribers and sometimes between their

15

own subscribers and those of other networks. In addition, these service providers act as a gateway for their subscribers to the Internet or the World Wide Web.

c.    The Internet allows users, while still maintaining anonymity, to easily locate (i) other individuals with similar interests in child pornography; and (ii) websites that offer images of child pornography.  Child pornography collectors can use standard Internet connections, such as those provided by businesses, universities, and government agencies, to communicate with each other and to distribute child pornography.  These communication links allow contacts around the world as easily as calling next door. Additionally, these communications can be quick, relatively secure, and as anonymous as desired.  All of these advantages, which promote anonymity for both the distributor and recipient, are well known and are the foundation of transactions between child pornography collectors over the Internet. Sometimes the only way to identify both parties and verify the transportation of child pornography over the Internet is to examine the recipient's computer, including the Internet history and cache[3] to look for "footprints" of the websites and images accessed by the recipient.

d.    The computer's capability to store images in digital form makes it an ideal repository for child pornography.  A single floppy disk can store dozens of images and hundreds of pages of text.  The size of the electronic storage media (commonly referred to as a hard drive) used in home computers has grown tremendously within the last several years. Hard drives with the capacity of 40 gigabytes are not uncommon.  These drives can store

---

[3]  "Cache" refers to text, image and graphic files sent to and temporarily stored by a user's computer from a web site accessed by the user in order to allow the user speedier access to and interaction with that web site.

thousands of images at very high resolution.
Magnetic storage located in host computers adds
another dimension to the equation. It is
possible to use a video camera to capture an
image, process that image in a computer with a
video capture board, and save that image to
storage in another country. Once this is done,
there is no readily apparent evidence at the
"scene of the crime". Only with careful
laboratory examination of electronic storage
devices is it possible to recreate the evidence
trail.

### Overview of the Underlying New Jersey Investigation

12. The information set forth below is provided as a broad

overview of the investigation conducted to date. It does not

include a listing of all investigative techniques employed or

even the full and complete results of any of the listed

investigative efforts.

13. The United States Attorney's Office for the District of New

Jersey ("USAO DNJ"), the U.S. Department of Justice's Child

Exploitation and Obscenity Section ("CEOS"), and the New Jersey

offices of ICE, Internal Revenue Service, Criminal Investigations

Division ("IRS CID"), the United States Postal Inspection Service

("USPIS"), and the Federal Bureau of Investigation ("FBI")

conducted a joint investigation (the "New Jersey Investigation")

of Regpay, a third-party billing and credit card aggregating

company. The investigation revealed that Regpay conspired with

other website operators to commercially distribute child

pornography by providing the other websites with billing and

credit card aggregating services, and taking a percentage of the

other websites' illegal proceeds.  The investigation also
revealed that Regpay itself operated several websites that sold
child pornography.

A.   **Regpay's Billing Service Operations for Child
     Pornography Websites**

14.  The New Jersey Investigation revealed that (1)  Regpay
operated regpay.com, a website that it used to conduct its
billing services; (2)  the regpay.com website was housed on a
server at Verio, Inc.; (3)  Regpay leased IP addresses at
Rackspace Managed Hosting ("Rackspace"), and Regpay housed its
customer databases including customer transaction records on
servers at Rackspace; (4) Regpay obtained the assistance of
Connections USA, Inc. ("Connections"), which is located in
Florida, to coordinate its billing and credit card processing
services; and (5) Connections processed at least $3,000,000 for
Regpay between November 1, 2002 and April 30, 2003 including
credit card transactions that Connections processed for Regpay
through Iserve.com ("Iserve"), an e-commerce company that
purportedly provides a variety of payment processing services,
including the performance of credit card and check processing,
for computer websites that offer membership subscriptions to the
public.

15.  During the course of the New Jersey Investigation of Regpay,
federal agents, acting in an undercover capacity ("the UC
Agents"), became paid subscribers/members of websites that used

Regpay as a billing company.[4]  In many instances, when a UC agent
subscribed to a website or purchased a membership to a website
using a credit card, a billing page automatically appeared on the
computer screen, which sought personal and financial information,
and revealed that the transaction was being processed by or
through Regpay.  At the top of the billing page was a logo
containing the letters "rp" and the word "regpay," as well as the
name of the website to which the undercover agent was seeking to
subscribe or purchase.  After completing the form, which included
providing a credit card number to be used for the purchase, each
UC agent was instructed to "hit the JOIN NOW! button" on the
screen.  Shortly after clicking on the "JOIN NOW!" button, each
UC agent received a message from Regpay stating that Regpay
successfully charged the provided credit card.  The message
provided each agent with a transaction number, log-in
information, and a password to log into the members-only site.
The message stated that "Iserve will appear on your credit card
statement as a beneficiary of this transaction."  After
successfully making the credit card purchase, each UC agent was
allowed unlimited access to the members-only portion of the
purchased site for a one month period.

16.  In some instances, shortly after receiving the above

---

[4]  The investigation revealed that not all of those websites
used Regpay exclusively; some of those websites used multiple
billing companies.

described message from Regpay, the agent/purchaser also received
a message from "Iserve.com," thanking the customer for using
Regpay, and indicating that Iserve would appear on the customer's
billing statement.  The message thereafter provided the date and
time of the transaction, a transaction number, and the amount of
the transaction.  Records later obtained from the banks that
issued the credit cards used in several of the undercover
purchases listed  "Iserve"for each of these transactions.

17.  As part the New Jersey Investigation of Regpay, information
housed on various servers that helped facilitate customer
transactions for hundreds of websites was seized from several
locations in the United States pursuant to several search
warrants.  After analyzing the customer data, the ICE forensic
agents identified tens of thousands of purchases of memberships
to websites between January 2003 and July 2003 that had contained
child pornography at the time of the UC agent's purchases at
specific dates and times between January 2003 and July 2003, that
is tens of thousands of confirmed subscriptions which granted
purchasers access to those websites.

18.  Further, undercover purchases made by ICE agents (described
above in paragraphs 15-16) prior to executing search warrants for
Regpay's customer transactional information, were found to be
recorded in the database found on Regpay's Rackspace server.  ICE
forensic specialists determined that the Regpay database operated

under a database management system called "MySQL", and that this
database's contents and structure were thus legible.  In other
words, upon finding that the database operated using the MySQL
system, and that the coding was intelligible, ICE forensic
experts determined that they could decipher Regpay's customer
transactional data and use it to identify the subscribers/members
of the websites to whom Regpay had provided third-party billing
services.

19.  At various times between February and September 2003,
federal agents verified that at least 21 websites that Regpay had
been servicing were still active, accessible on the Internet, and
contained child pornography.  They did so by accessing these
websites on the Internet and subscribing to those sites that
advertised child pornography or showed actionable images in their
"preview" or "nonmember" sections.

20.  Based on the customer transaction records obtained through
the execution of search warrants which revealed customer
subscriptions to websites that federal agents had independently
verified as containing child pornography, the ICE Cyber Crimes
Center identified various individuals as subscribers to websites
containing child pornography.  In turn, the ICE Cyber Crimes
Center sent leads to field offices across the country.  This
search warrant application of the SUBJECT PREMISES and SUBJECT
VEHICLE evolved from one of those leads.

**B.**  **ICE analysis of Regpay's customer transactional data**

21.  By way of background, and as noted earlier, Regpay's customer transactional information was found to be recorded in the database found on Regpay's Rackspace server, which was searched pursuant to a warrant.  ICE forensic specialists examined the source code[5] or 'scripts' used to populate the various fields in the Rackspace database, and determined how each of the fields pertaining to the websites' customers (hereinafter, "subscriber(s)/member(s)") were generated by Regpay's web page programming.

22.  The ICE forensic specialists learned that when Regpay had served as the billing company for the members-only websites that contained child pornography, the subscribers/members of these websites would input certain information when a billing page would appear.  That information was then recorded by Regpay in fields that it maintained in its database.

23.  The fields that appeared in the Regpay customer information data, which ICE forensic specialists determined had been completed based upon information provided by the websites' subscribers/members were:

a.  **fname**, referring to the website subscriber/member's first name as entered on the Regpay form;

---

[5]  Source code is computer software programming statements and instructions.

22

b.  **lname**, referring to the website subscriber/member's last name of the customer as entered on the Regpay form;

c.  **addr**, referring to the website subscriber/member's street address as entered on the Regpay form;

d.  **city**, referring to the website subscriber/member's city as entered on the Regpay form;

e.  **state**, referring to the website subscriber/member's state as entered on the Regpay form;

f.  **zip**, referring to the website subscriber/member's zip code as entered on the Regpay form;

g.  **phone**, referring to the website subscriber/member's telephone number as entered on the Regpay form;

h.  **country**; referring to the website subscriber/member's country as entered on the Regpay form;

i.  **ccnumber**, referring to the website subscriber/member's credit card number as entered on the Regpay form;

j.  **cvv2**, referring to the website subscriber/member's three digit number from the credit card, as entered on the Regpay form;

k.  **card_type**, referring to the website subscriber/member's credit card, as entered on the Regpay form;

l.  **expmonth**, referring to the website subscriber/member's credit card, as entered on the Regpay form;

m.  **expyear**, referring to the website subscriber/member's credit card expiration date, as entered on the Regpay form;

n.  **email**, referring to the website subscriber/member's e-mail address as entered on the Regpay form.

24.  Federal agents who had subscribed, in their undercover capacity, to one or more websites containing child pornography, and whose transactional information was found to be among the consumer transaction data seized during the searches of Rackspace's Regpay servers, verified that the information pertaining to the transactions they had conducted was contained as each of them had input it in the Regpay database.

25.  ICE Cyber Crime Center determined that a field in the "members" table of the Regpay database called "siteid" was a unique identifier that correlated each subscription purchase to a website listed in the "sites" table of the database.  ICE agents were able to determine which website each customer purchased by correlating the siteid entry in the "members" table to the relevant "sites" table entry.

26.  In addition to determining which fields were completed by subscribers/members, forensic specialists at ICE's Cyber Crime Center also determined that the following fields on the Regpay customer transaction forms were generated automatically by Regpay's coding or script, and then stored in Regpay's MySQL database:

a.    **login**, referring to the access user name;

b.    **passwd**, referring to a randomly generated 8 character password;

c.    **regtime**; referring to the hour:minute:second the script ran (according to the host machine).

27.    The fact that the fields referenced in paragraph 26 were computer-generated and were relayed to subscribers/members prior to their entry into the purchased websites is significant.    Based on my training and conversations with other agents, although a website subscriber/member could easily provide a false name when subscribing to websites, the subscriber/member most certainly had to provide a legitimate credit card number and e-mail account in order to subscribe to/become a member of the website.    This is because the subscriber/member would have been required to provide a valid e-mail account in order to actually enter the website in which s/he was interested.    In fact, entry into the members-only websites that contained child pornography must have been preceded by the subscriber/member's receipt of an e-mail that, along with confirmation that the credit card purchase had been successfully completed, included the subscriber/member's computer-generated password, as well as instructions needed to access the website (see paragraph 15).    Inaccurate credit card or e-mail information would have precluded entry into the website.    Given the likely accuracy of the e-mail address and credit card information

25

provided by the subscriber/member, federal agents focused on that information to identify subscribers/members.

### Probable Cause to Search the Subject Premises

28.  Upon receipt of a lead from the ICE Cyber Crimes Center, the undersigned Affiant, working with other agents in the Boston field office commenced an investigation, which revealed that on or about March 15, 2003, an individual whose e-mail address is vzelkk2n@verizon.net, using the name Darren Wilder and using credit card number 5410654922336711, did knowingly and willfully pay for and subscribe to a website (using a computer) later confirmed to contain child pornography.  Based on the investigation and my training and experience, there is probable cause to believe that Darren Wilder is a recipient and collector of child pornography, and that evidence of his receipt and possession of child pornography will be found at his residence, the SUBJECT PREMISES.

29.  More specifically, in the course of analyzing the Regpay customer transactional data that had been seized pursuant to the search warrants referenced above, it was discovered that an individual using the email address vzelkk2n@verizon.net subscribed to a members-only website, www.lust-gallery.com.  The investigation further revealed that the individual using the e-mail account vzelkk2n@verizon.net used a credit card to purchase access to a members-only website on or about March 15, 2003,

specifically, a card issued by Citibank with a card number of

5410654922336711.

30.  The members-only site purchased by vzelkk2n@verizon.net

permitted electronic access to child pornography.

31.  On March 26, 2003, a federal agent, while acting in an

undercover capacity, purchased a one-month membership, in the

approximate amount of $49.95 + additional fees, to a website

entitled "Lust Gallery," found at www.lust-gallery.com.  A credit

card number was provided to effect this transaction.  The

information appearing in the address box of the undercover

agent's internet browser while viewing the subscription page was

http://64.239.16.69/sale.cgi?s=91111&ad=ad00094313.  The name

"regpay" appeared in relatively large letters on the webpages as

the main billing company and on the approval page in smaller type

was the name "ISERVE", which was listed as the "beneficiary of

this transaction."  Additional information on the approval page

included the transaction number: 178628, a login: me01793961, a

password: 4YHdhagp, and a members URL of

http://69.0.255.118/members/.  Using this information, the

undercover agent accessed the website and downloaded images of

children engaged in sexually explicit conduct.  Contained on the

website were numerous pictures depicting minor females in various

poses and states of undress.  Specifically, three of the images

contained on the website are described as follows:

A. **35&back=30**: This image features a prepubescent, nude female raising the left leg of a second prepubescent, nude female, exhibiting the genitals of the second prepubescent female.

B. **7&back=0**: This image features a closeup of the genital and anal area of a prepubescent nude female with her legs apart exhibiting her genitals.

C. **31&back=30**: This image features a closeup of the genital area of a pubescent nude female squatting on the floor with her legs spread apart.

32. On July 24, 2003, another federal agent, acting in an undercover capacity, purchased a one-month membership, for approximately $57.90, to a website with a URL of www.lust-gallery.com. The undercover agent used an UC credit card, which was provided to a billing company identifying itself as "Regpay." Regpay thereafter provided the undercover agent with a transaction number: 295855, a login: me01901994, a password: 6Sp3Gqmg, and a members URL of http://69.0.237.226/members. Using this information, the undercover agent accessed the website and downloaded images of children engaged in sexually explicit conduct. The home page of the website features images of several females of various poses, and an invitation to become a member of the website. Contained within the website were numerous pictures of young girls in various poses and states of undress.

Specifically, three of the images contained in this website when accessed by this undercover agent are described as follows:

A.  **Photo 2400 of 9833 (Set #8):** This image features a frontal view of a prepubescent female and another minor female, who are sitting on a wooden table.  The left most female is sitting on the table leaning back on her hands slightly, her legs bent at the knees and are spread apart exposing both her genital and anal region.  Her undeveloped breasts are also exposed.

B.  **Photo 7508 of 9833 (Set #23):** This image features two prepubescent females.  The right most female is lying partially on her back on what appears to be a multi-colored cover on top of a mattress on the floor.  Her legs are extended over her head and her toes are touching the floor, above her head, her legs are parted and both her genital and anal region is exposed.  The left most female is sitting on the mattress, her left leg is bent at the knee, resting it on the mattress, parallel to the floor.  The right leg is bent up at the knee and the female is leaning forward, leaning her upper bodice on her thigh.  The photo was taken from a frontal viewpoint.

C.  **Photo 208 of 9833 (Set #1):** This image features two minor females.  The two minor females are on a bed, and are on their hands and knees facing away from the view point of the camera.  Both minor females have their legs parted, exposing their genital and anal region.

33.   The undersigned Affiant reviewed a hard drive, which
contained digitally preserved copies of the above-listed website
purchased by undercover agents on July 24, 2003, that was sent to
my ICE field office. The undersigned Affiant has also personally
reviewed the content of the above website, purchased by
vzelkk2n@verizon.net that were digitally preserved and the
content copied to the hard drive by ICE Agents at the Cyber
Crimes Center in Fairfax Virginia.  Law enforcement officers with
expertise in the field of child pornography reviewed several
images from each of those websites and concluded that they
constitute child pornography.

34.   In addition, the undersigned Affiant reviewed the preview
page of www.lust-gallery.com, as preserved by law enforcement on
March 26, 2003, and found the following: The top of the page
states "LUST GALLERY - a Secret Lolitas Archive".  It is followed
by text stating: "That you're here means you're a member of one
of the sites created by RedStudio.  This website was developed
exclusively for our members and will never be revealed to the
general public.  Because you were a subscriber before, we know
what you like and need.  And we're here to give EXACTLY the
things you like EXACTLY the way you like them."  This text is
followed by thumbnail photos appearing one after the other across
the width of the screen.  Each image shows at least two unclothed
minors with some images focused on the minor's genitalia.  After

the first row of images further text appears and states "Lust Gallery contains thousands of EXCLUSIVE images never published before.  Moreover, inside we have something THAT HAS NEVER BEEN SHOWN BEFORE UNTIL NOW!"  This text if followed by another paragraph stating: "All models inside are 14 or younger, every image shows at least 2 or 3 girls, every gallery is at least 50 images.  Currently we have over 3500 high quality digital photos in over 40 sets.  The collection is updated weekly so there is always something new for you to enjoy.  Created by real young model lovers for real young model lovers.  Lust Gallery is truly an elite product. We guarantee you complete satisfaction for a truly unforgettable experience."  This text is followed by another row of thumbnail images going across the width of the screen.  Each image shows at least two unclothed minors with some images focused on the minor's genitalia.  Further text follows these images.    As noted above, the preview page is what a customer would typically see before deciding to purchase or subscribe to the website.

35.  Verizon is an ISP through which the email account vzelkk2n@verizon.net was issued.  Records from Verizon reveal that the e-mail address vzelkk2n@verizon.com is assigned to Darren Wilder whose billing address is 5 Valley Road, Dracut, Massachusetts 01826 (the SUBJECT PREMISES).

36. Verizon also confirmed that Darren Wilder's account was activated on November 22, 2002; that the account was active at the time of the purchase described above and is still active.

37. Furthermore, information from Citibank, the credit card company that issued a credit card used to make the purchase described above, reveals that Darren Wilder is the account holder, and that his billing address at the time of the above described purchase was 551 Hildreth Street, Dracut, Massachusetts, 01826. The records from Citibank further reveal the following purchase, among others:

| Date | Ref. No. | Description of Transaction | Amount |
|------|----------|---------------------------|--------|
| 03/15/ 03 | CSPJ02T1 | ISERVE *8009290300 800-929- 0300 FL | $57.90 |

The credit card purchase on March 15, 2003 corresponds with the date that vzelkk2n@verizon.net purchased access to www.lust-gallery.com as listed in the leads sent by the Cyber Crimes Center that were taken from Regpay's customer database, and list Iserve as the beneficiary of the transaction. Based on the verification of undercover transactions described above in paragraphs 15-16, agents determined that the credit card purchases correspond with other purchases as reflected in the customer transaction records maintained by Regpay on the Rackspace servers, and fell either on the exact day or one day before the recorded purchase.

38.  Additional investigation of Darren Wilder revealed that he has a prior criminal conviction in the United States District Court for the District of Massachusetts for possession of child pornography in violation of Title 18, United States Code, Section 2252A(a)(5)(B).  On November 9, 2000, Darren Wilder was sentenced in that case to 27 months incarceration, followed by two years of supervised release.  The underlying specific allegations for this prior offense were that between December 1999 and January of 2000, Wilder, using a computer, arranged to purchase through an undercover website a videotape containing child pornography.  The videotape was advertised on the undercover web site as illegal material containing images of child pornography specifically depicting a 12 year old girl.  At the time of delivery of the videotape ordered by Wilder, law enforcement officers had a search warrant to search his residence.  The search warrant execution revealed that Wilder was in possession of fourteen computer disks containing numerous images of child pornography, including graphic images of minors engaged in sexually explicit conduct.  Wilder admitted to law enforcement officers at that time that he collected these images off the Internet over a several year period of time.

39.  On November 1, 2002, Wilder was released from incarceration on his child pornography sentence and placed on supervised release.  As of the date of this affidavit, Wilder is currently

on supervised release. Wilder's United States Probation Officer
("P.O.") is Craig Orze, from the District of Massachusetts with
an office address of 499 Essex Street, Suite 3, Lawrence,
Massachusetts.

40.  P.O. Orze reports the following: On or about November 1,
2003, Wilder moved from 551 Hildreth Street, Dracut,
Massachusetts to 5 Valley Road, Dracut, Massachusetts (the
SUBJECT PREMISES).   P.O. Orze has been to the SUBJECT PREMISES
on a number of occasions and as recently as November 19 and
December 30, 2003.  While at the SUBJECT PREMISES, P.O. Orze
observed that Wilder still has a computer which he observed to be
located in a spare bedroom/office room in the residence.  In
addition, P.O. Orze has had numerous conversations with Wilder
specifically confirming that he has Internet access at home, as
it is needed for Wilder to continue in his occupation as a Mac
Tools salesperson.  Wilder also informed P.O. Orze that in
addition to his desktop computer he has a laptop (portable)
computer that P.O. Orze observed on November 19, 2003 to be in
the SUBJECT VEHICLE and on December 30, 2003 to be in the SUBJECT
PREMISES.   Wilder further informed P.O. Orze that he uses the
laptop computer when he travels for business.  The SUBJECT
VEHICLE was subsequently identified as a 2004 Ford Pickup Truck
bearing license plate number MA 50651.   P.O. Orze also confirmed

Wilder lives alone at the SUBJECT PREMISES and that he works from his residence.

41. Information provided by the Massachusetts Electric Company has identified the holder of an electric utilities account for services provided at the SUBJECT PREMISES as Darren Wilder. The service was established on October 29, 2003.

42. As of January 7, 2003, information obtained from the Commonwealth of Massachusetts indicates that Darren Wilder has a Massachusetts driver's license indicating an address of 5 Valley Road, Dracut, Massachusetts (the SUBJECT PREMISES).

43. On December 23, 2003 and January 8, 2004, your Affiant drove by the SUBJECT PREMISES and observed the SUBJECT VEHICLE, a 2004 Ford Pickup Truck located in the driveway of the SUBJECT PREMISES bearing a license plate number of MA 50651. Information obtained from the Commonwealth of Massachusetts, Registry of Motor Vehicles revealed that it is registered to Darren Wilder.

44. Information obtained from Verizon indicates that Wilder currently subscribes to Internet services from Verizon and has a billing address of 5 Valley Road, Dracut, Massachusetts 01826 (the SUBJECT PREMISES) and that the service is active. In addition, Verizon records reveal an assigned email address of vzelkk2n@verizon.net.

45. Based upon the information provided by P.O. Craig Orze, Verizon, Massachusetts Electric Company and the Commonwealth of

Massachusetts, this Affiant believes that the individual using
the email address of vze1kk2n@verizon.net is Darren Wilder, who
lives at the SUBJECT PREMISES and owns the SUBJECT VEHICLE.

46.  Based upon my training and speaking with Special Agent and
Group Supervisor, John MacKinnon of ICE, whose background
includes having been a special agent with ICE/U.S. Customs for 15
years, and participating in over 200 child pornography
investigations over the past 8 years, participating in over 50
searches relating specifically to child pornography offenses, and
having instructed over 7,000 law enforcement officers
specifically on conducting child pornography investigations, as
well as my discussions with other law enforcement officers with
experience in the area of child exploitation, there are certain
characteristics common to individuals involved in the receipt and
collection of child pornography:

> a.   Child pornography collectors may receive
> sexual gratification, stimulation, and
> satisfaction from contact with children; or
> from fantasies they may have viewing children
> engaged in sexual activity or in sexually
> suggestive poses, such as in person, in
> photographs, or other visual media; or from
> literature describing such activity.
>
> b.   Collectors of child pornography may
> collect sexually explicit or suggestive
> materials, in a variety of media, including
> photographs, magazines, motion pictures, video
> tapes, books, slides and/or drawings or other
> visual media.  Child pornography collectors
> oftentimes use these materials for their own
> sexual arousal and gratification.  Further,
> they may use these materials to lower the

inhibitions of children they are attempting to seduce, to arouse the selected child partner, or to demonstrate the desired sexual acts.

c.    Collectors of child pornography almost always possess and maintain their "hard copies" of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc., in the privacy and security of their home or some other secure location.  Child pornography collectors typically retain pictures, films, photographs, negatives, magazines, correspondence, books, tape recordings, mailing lists, child erotica,[6] and video tapes for many years.

d.    Likewise, collectors of child pornography often maintain their collections that are in a digital or electronic format in a safe, secure and private environment, such as a computer and surrounding area.  These collections are often maintained for several years and are kept close by, usually at the collector's residence, to enable the collector to view the collection, which is valued highly.

e.    Child pornography collectors also may correspond with and/or meet others to share information and materials; rarely destroy correspondence from other child pornography distributors/collectors; conceal such correspondence as they do their sexually explicit material; and often maintain lists of names, addresses, and telephone numbers of individuals with whom they have been in contact

---

[6] "Child erotica," as used in this Affidavit, is defined as materials or items that are sexually arousing to certain individuals but which are not in and of themselves obscene or do not necessarily depict minors in sexually explicit poses or positions.  Such material may include non-sexually explicit photographs (such as minors depicted in undergarments in department store catalogs or advertising circulars), drawings, or sketches, written descriptions/stories, or journals.

and who share the same interests in child
pornography.

f.    Collectors of child pornography prefer not
to be without their child pornography for any
prolonged time period.  This behavior has been
documented by law enforcement officers involved
in the investigation of child pornography
throughout the world.

47.  The undersigned Affiant submits that there is probable cause

to believe that Darren Wilder, utilizing Internet access through

Verizon, at 5 Valley Road, Dracut Massachusetts, (SUBJECT

PREMISES) is a collector of child pornography.  This opinion is

based in part upon the following:

(a) Darren Wilder's purchase of a membership to a child

pornography website;

(b) Wilder's prior criminal conviction for possession of child

pornography in November of 2000;

(c) Wilder's prior use of a computer to order child pornography;

(d) The preview page of the website membership purchased by

Wilder indicating the nature of the images on the website for

which he subscribed – sexually explicit pictures of young girls –

14 and under.

48.  Finally, based upon the conduct of individuals involved in

the collection of child pornography set forth above in paragraph

43, namely, that they tend to maintain their collections at a

secure, private location for long periods of time, there is

probable cause to believe that evidence of the offenses of

receiving and possessing child pornography is currently located at the SUBJECT PREMISES.

### Specifics Regarding the Seizure and Searching of Computer Systems

49.  Based on my own experience and consultation with other agents who have been involved in the search of computers and retrieval of data from computer systems and related peripherals, and computer media, there are several reasons why a complete search and seizure of information from computers often requires seizure of all electronic storage devices, as well as all related peripherals, to permit a thorough search later by qualified computer experts in a laboratory or other controlled environment:

> a.  Computer storage devices, such as hard disks, diskettes, tapes, laser disks, can store the equivalent of hundreds of thousands of pages of information.  Additionally, when an individual seeks to conceal information that may constitute criminal evidence, that individual may store the information in random order with deceptive file names.  As a result, it may be necessary for law enforcement authorities performing a search to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity.  This review and sorting process can take weeks or months, depending on the volume of data stored, and would be impossible to attempt during a search on site; and

> b.  Searching computer systems for criminal evidence is a highly technical process, requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even those who are computer experts to specialize in some systems and applications.

It is difficult to know before a search what type of hardware and software are present and therefore which experts will be required to analyze the subject system and its data. In any event, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a booby trap), a controlled environment is essential to its complete and accurate analysis.

50. Based on my own training and my consultation with other agents who have been involved in computer searches, searching computerized information for evidence or instrumentalities of a crime often requires the seizure of all of a computer system's input and output peripheral devices, related software, documentation, and data security devices (including passwords) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. There are several reasons that compel this conclusion:

a.   The peripheral devices that allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the analyst be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence listed above. In addition, the analyst needs

40

the relevant system software (operating
systems, interfaces, and hardware drivers) and
any applications software which may have been
used to create the data (whether stored on hard
drives or on external media), as well as all
related instruction manuals or other
documentation and data security devices; and

b.    In order to fully retrieve data from a
computer system, the analyst also needs all
magnetic storage devices, as well as the
central processing unit (CPU).  In cases like
the instant one where the evidence consists
partly of image files, the monitor and printer
are also essential to show the nature and
quality of the graphic images which the system
could produce.  Further, the analyst again
needs all the system software (operating
systems or interfaces, and hardware drivers)
and any applications software which may have
been used to create the data (whether stored on
hard drives or on external media) for proper
data retrieval.

c.    I am familiar with and understand the
implications of the Privacy Protection Act
("PPA"), 42 U.S.C. § 2000aa, and the role of
this statute in protecting First Amendment
activities.  I am not aware that any of the
materials to be searched and seized from the
SUBJECT PREMISES are protected materials
pursuant to the PPA.  If any such protected
materials are inadvertently seized, all efforts
will be made to return these materials to their
authors as quickly as possible.

**Conclusion**

51.  Based on the above information, I believe probable cause

exists to conclude that Darren Wilder has violated various

provisions of 18 U.S.C. §§ 2252 and 2252A, relating to child

pornography, and that there exists evidence, fruits and

instrumentalities of the above identified crimes located at the

SUBJECT PREMISES and in the SUBJECT VEHICLE, as more fully described in Schedule A attached hereto.

_____
Colleen Forgetta
Special Agent, ICE

Subscribed and sworn to before me this 14th of January 2004.

_____
ROBERT B. COLLINGS
United States Magistrate Judge

# EXHIBIT 2

AO 106 (Rev. 7/87) Affidavit for Search Warrant

# United States District Court

### DISTRICT OF MASSACHUSETTS

In the Matter of the Search of
(Name, address or brief description of person, property or premises to be searched)

the residence of Darren Wilder, located at 5 Valley Road, Dracut, Massachusetts 01826, more specifically described as a single story, single family residence with an attached garage ; and the 2004 Ford pick-up truck, bearing MA registration 50651, registered to Darren Wilder

**APPLICATION AND AFFIDAVIT FOR SEARCH WARRANT**

CASE NUMBER: *2004 m 0431 RBC*

I Colleen Forgetta being duly sworn depose and say:

I am a(n) _____ Special Agent, I.C.E. _____ and have reason to believe
                        Official Title

that ☐ on the person of or ☒ on the property or premises known as (name, description and/or location)

the residence of Darren Wilder, located at 5 Valley Road, Dracut, Massachusetts 01826, more specifically described as a single story, single family residence with an attached garage; and the 2004 Ford pick-up truck, bearing MA registration 50651, registered to Darren Wilder

in the _____ District of _____ Massachusetts _____
there is now concealed a certain person or property, namely (describe the person or property to be seized)

see Schedule A attached hereto

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
property that constitutes evidence of a criminal offense, contraband and things otherwise criminally possessed and property that has been used as a means of committing a criminal offense

concerning a violation of Title _____ 18 _____ United States code, Section(s) _____ 2252 and 2252A _____.
The facts to support a finding of Probable Cause are as follows:

see attached affidavit of Colleen Forgetta

Continued on the attached sheet and made a part hereof.  ☒ Yes  ☐ No

_____
Signature of Affiant
COLLEEN FORGETTA

Sworn to before me, and subscribed in my presence
JAN 1 4 2004

_____
Date

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer

at   Boston, MA
     City and State

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

SUBJECT PREMISES and in the SUBJECT VEHICLE, as more fully
described in Schedule A attached hereto.

_Colleen C. Forgetta_
Colleen Forgetta
Special Agent, ICE

Subscribed and sworn to before me this 14th of January 2004.

_Robert B. Collings_
ROBERT B. COLLINGS
United States Magistrate Judge

I have viewed the images denoted 7&back = 0 and 31&back = 30 and find that they depict minors engaged in "sexually explicit conduct" specifically, "lascivious exhibition of the genitals" of the minors. 18 USC § 2256 (1)(2)(E).

JAN 1 4 2004

USM
42