IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA            )
                                    )
            Plaintiff               )
                                    )        Criminal No. 04-10217-GAO
            v.                      )
                                    )
DARREN F. WILDER                    )
                                    )
            Defendant               )
_____)


**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION *IN LIMINE*
TO PRECLUDE EVIDENCE OF TESTIMONY REGARDING
ENCASE FORENSIC SOFTWARE**


The United States of America, by and through its counsel,
Michael J. Sullivan, United States Attorney for the District of
Massachusetts, Assistant United States Attorney Dana Gershengorn
and Sherri A. Stephan, Trial Attorney, United States Department
of Justice, Criminal Division, Child Exploitation and Obscenity
Section, hereby files this opposition to Defendant's motion *in
limine* seeking to preclude expert testimony regarding Encase
forensic software.

### I.     PRELIMINARY STATEMENT

The Defendant, Darren Wilder, is charged with transporting,
receiving and possessing visual depictions of minors engaged in
sexually explicit conduct, in violation of Title 18, United
States Code, Section 2252.  Defendant now seeks to preclude

evidence and testimony at trial related to the use of forensic
software referred to as EnCase.  Defendant argues EnCase does not
pass muster under Daubert v. Merrell Dow Pharmaceuticals, Inc.
509 U.S. 579 (2003).   To the contrary, EnCase is a reliable
forensic tool used and relied upon worldwide by both government
and the private sector.

## II.    ENCASE FORENSIC SOFTWARE

EnCase forensic software (Encase) was used by the
Government's expert computer forensic analyst to analyze the
computer evidence seized from Defendant's residence.  It is
anticipated the Government expert's testimony would include how
EnCase was employed to recover and view both active and deleted
files, including text and image files from Defendant's computer
hard drive.  EnCase is a tool used to uncover, analyze and
present forensic data.  EnCase is used by law enforcement
agencies worldwide to aid in the analysis of seized computer
evidence and has been accepted and admitted in federal and state
courts throughout the country.   EnCase has been subject to
testing, received peer review and publication, and is generally
accepted as a valid and reliable forensic tool.  As a result, it
is worthy of judicial notice of its acceptance and reliability,
and Defendant's request for a Daubert hearing should be denied.

## III. ARGUMENT

Before admitting the testimony of an expert witness, the trial judge is required to evaluate both the relevance and reliability of the proposed testimony.  Daubert v. Merrell Dow Pharaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).   The Supreme Court stated that the relevance requirement is already embodied in Rule 702; "the evidence or testimony [is relevant when it] 'assist[s] the trier of fact to understand the evidence or to determine a fact in issue.'" Daubert, 509 U.S. at 591 citing Fed.R.Evid. 702.  Reliability goes to the methodology used to reach the conclusion forming an expert witness's opinion.  Id. At 595.

Until Daubert, the most widely prevailing standard for determining the admissibility of novel scientific evidence was that announced in Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923).  There the court held that the principle or discovery upon which such evidence was based must have "gained general acceptance in the particular field in which it belongs" before such evidence is admissible.  Id.  In the aftermath of that case, the Frye "general acceptance test," as it has come to be known, itself gained widespread acceptance and the state and federal cases applying it are legion.  Daubert, however, changed the landscape.

In that case, the district court applied the Frye test to proffered expert testimony attempting to link the drug Bendectin

to the plaintiffs' birth defects and found such evidence wanting;

consequently the court excluded it.  <u>Daubert</u>, 509 U.S. at 583-

584.  The Court of Appeals affirmed that evidentiary ruling,

likewise concluding that the evidence failed to satisfy the <u>Frye</u>

test.  <u>Id</u>. at 584.  The Supreme Court reversed, holding that Fed.

R. Evid. 702 superseded the <u>Frye</u> test and that it was the

standard by which the admissibility of scientific testimony was

to be measured.[1]  <u>Id</u>. at 587-588.  In so doing, the Court

characterized the <u>Frye</u> test as "rigid" and "austere," and it

stated that that test is "at odds with the 'liberal thrust' of

the Federal Rules and their 'general approach of relaxing

traditional barriers to "opinion" testimony.'" <u>Id</u>. at 588-589

(quoting <u>Beech Aircraft Corp. v. Rainey</u>, 488 U.S. 153, 169

(1988).  Thus, the Court made clear, Rule 702 was intended to

expand the universe of admissible expert testimony beyond that

which the <u>Frye</u> test would have permitted.[2]

---

[1]  Rule 702 states:  If scientific, technical, or other
specialized knowledge will assist the trier of fact to understand
the evidence or to determine a fact in issue, a witness qualified
as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of opinion or
otherwise.  Fed. R. Evid. 702.

3 That this is so is especially apparent from the following
passage in the Court's opinion:
Vigorous cross-examination, presentation of contrary evidence,
and careful instruction on the burden of proof are the
traditional and appropriate means of attacking shaky but
admissible evidence.  In addition, in the event the trial court
concludes that the scintilla of evidence presented supporting a
position is insufficient to allow a reasonable juror to conclude

The Court nonetheless recognized that under Rule 702 trial judges retain a gatekeeping function with respect to scientific testimony, as they are charged with ensuring that such testimony is both relevant and reliable.  Id. at 589-590.  More specifically, the Court stated that judges must make a preliminary assessment of whether the reasoning or methodology underlying the proffered testimony is scientifically valid and whether it can properly be applied to the facts in issue.  Id. at 592-593.  While emphasizing that the inquiry envisioned by Rule 702 is "a flexible one," the Court identified several factors which would ordinarily be pertinent: (1) whether the theory or technique in issue can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the technique; and (4) whether the theory or technique has gained general acceptance within a relevant scientific community.  Id. at 593-594.  Thus, the Court recast the Frye test as but one factor that a court might consider in making the admissibility determination.

---

that the position is more likely than not true, the court remains
free to direct a judgment, Fed. R. Civ. Proc. 50(a), and likewise
to grant summary judgment, Fed. R. Civ. Proc. 56. . . . These
conventional devices, rather than wholesale exclusion under an
uncompromising 'general acceptance' test, are the appropriate
safeguards where the basis of scientific testimony meets the
standards of Rule 702.  Daubert, 509 U.S. at 596 (internal cases
citations and parentheticals omitted).

Following Daubert, lower courts were divided on the question whether its teachings applied only to expert scientific testimony or whether the Court had intended Daubert to encompass other expert testimony as well, such as that based on specialized (non-scientific) knowledge. The Court answered that question in Kuhmo Tire, a case involving proffered testimony of an expert in tire failure analysis regarding the cause of a tire blow out that had resulted in a fatal motor vehicle accident. 119 S. Ct. 1171-1172. Applying a Daubert Rule 702 analysis, the district court excluded the testimony and the Court of Appeals reversed, holding that Daubert was limited to scientific evidence, whereas the testimony at issue in Kuhmo Tire was predicated on "skill- or experience-based observation." Id. at 1173. The Supreme Court held that Daubert's general principles apply to all of the expert matters described in Rule 702. Id. at 1174-1175. It went on to emphasize the broad leeway afforded trial judges in determining the reliability of expert testimony and it made clear that the factors cited in Daubert might be pertinent to that inquiry in some cases but not in others and that still other identified factors may be considered on an ad hoc basis. Id. at 1175-1176.

Daubert and Kuhmo Tire both involved novel expert testimony. Nothing in those cases suggests that the Court intended to precipitate a reexamination of the reliability of expert testimony that has enjoyed longstanding acceptance by the courts.

Put another way, those cases do not suggest that in their

aftermath the government now bears the burden of proof in the

first instance of establishing the reliability of expert

testimony of that sort.  Indeed, several of the Court's

pronouncements in those cases can be read as evidencing a

contrary view.  For example, in Daubert, the Court stated,

> [W]ell established propositions are less likely to be
> challenged than those that are novel, and they are more
> handily defended.  Indeed, theories that are so firmly
> established as to have attained the status of scientific
> law, such as the laws of thermodynamics, properly are
> subject to judicial notice under Rule of Evidence 201.

509 U.S. 593 n.11.

To similar effect is a passage in the Court's Kuhmo Tire

opinion:

> The trial court must have the same kind of latitude in
> deciding how to test an expert's reliability, and to decide
> whether or when special briefing or other proceedings are
> needed to investigate reliability, as it enjoys when it
> decides whether or not that exert's testimony s reliable.
> . . . [A] court of appeals is to apply an abuse-of-
> discretion standard when it "review[s] a trial court's
> decision to admit or exclude expert testimony."  That
> standard applies as much to the trial court's decisions
> about how to determine reliability as to its ultimate
> conclusion.  Otherwise, the trial judge would lack the
> discretionary authority needed both to avoid unnecessary
> "reliability" proceedings in ordinary cases where the
> reliability of an expert's methods is properly taken for
> granted, and to require appropriate proceedings in the less
> usual or more complex cases where cause for questioning the
> expert's reliability arises.  Indeed, the Rules seek to
> avoid "unjustifiable expense and delay" as part of their
> search for "truth" and the "jus[t] determin[ation]" of
> proceedings.  Fed. R. Evid. 102.

Id. at 1176 (case citation omitted).  This passage too

demonstrates the Court's recognition that there are types of

expert testimony that are so well-established that their

reliability may be presumed by the trial court, without resort to

the needless delay and expense that a Daubert hearing would

entail.[3]

A number of lower courts have so construed Daubert and Kuhmo

Tire.  For example, in Johnson v. Commonwealth, 12 S.W.3d 258,

261 (Ky. 1999), a case in which the defendant challenged the

admissibility of microscopic hair analysis, the Supreme Court of

Kentucky read Daubert as recognizing that lower courts can take

judicial notice of scientific methods, techniques, and theories

that are firmly established and are not obliged to "reinvent[]

the wheel" in such instances.  The court properly recognized

that judicial notice of the reliability of a certain category of

expert testimony does not preclude proof to the contrary.  Id. at

262.  It reasoned, however, that such "judicial notice relieves

the proponent of the evidence from the obligation to prove in

court that which has previously been accepted as fact by the

---

[3]The Court in Kuhmo Tire also stated, "where such
testimony's factual basis, data, principles, methods, or their
application are called sufficiently into  question, . . . the
trial judge must determine whether the testimony has 'a reliable
basis in the knowledge and experience of [the relevant]
discipline.'" 119 S.Ct. at 1175 (quoting Daubert, 509 U.S. at
592).  The implication of that remark is that the opponent of
proffered expert testimony must sufficiently call into question
the reliability of such testimony before a so-called Daubert
hearing-- at which the proponent of the testimony would
admittedly bear the burden of proof-- is warranted or required.

appropriate appellate court.  It shifts to the opponent of the
evidence the burden to prove to the satisfaction of the trial
judge that such evidence is no longer deemed reliable."[4]  Id.
See also Goodyear Tire and Rubber Co. v. Thompson, 11 S.W.3d 575
(Ky. 2000) (although Daubert applies to all expert testimony
offered pursuant to Rule 702, "the application is markedly
different depending on whether the method or technique, upon
which the testimony is based, has been recognized as reliable by
existing caselaw").

The Supreme Court of Alaska is of a like view.  In State v.
Coon, 974 P.2d 386, 397-398 (Alaska 1999), a case involving a

---

[4]Applying those parameters to the precise factual issue
before it, the Kentucky Supreme Court in Johnson went on to
state:

> Although we have never specifically addressed the scientific
> reliability of this method of hair analysis, we must assume
> that it at least satisfied the Frye test of general
> acceptance; for otherwise, the evidence would never have
> been admitted in the first place.  The absence in our
> previous opinions of any in-depth analysis under the
> "general acceptance" test was probably due to the
> overwhelming acceptance of this procedure as a reliable
> scientific method for the past fifty years. . . . Based on
> the overwhelming acceptance of this evidence by other
> jurisdictions, as well as our own history of routine
> admission of this evidence at trial, trial courts in
> Kentucky can take judicial notice that this particular
> method or technique is deemed scientifically reliable.

Id. at 262-263.  Finding that the defendant had failed to prove
that such hair analysis was no longer reliable, the court
affirmed the trial court's ruling admitting the expert testimony.
Id. at 263-262.

challenge to the trial court's admission of spectographic voice

identification, the court abandoned the <u>Frye</u> test in favor of

<u>Daubert</u>.  In so doing, it had occasion to address the stated

concern of an amicus that under <u>Daubert</u> there will be increased

litigation regarding non-novel evidence that had been deemed

admissible under <u>Frye</u>.  The court stated,

> [W]hen an area of expertise is well-known and has been fully
> considered by the courts, a trial court may take judicial
> notice of its admissibility.  The Supreme Court advocated
> this approach.  Moreover, general acceptance remains a
> factor under Daubert.  It also seems unlikely that
> methodologies that were admitted under Frye and that remain
> generally accepted in the appropriate community will be
> excluded, absent affirmative evidence of unreliability.

<u>Id</u>. at 402 (footnotes omitted).

The District Court for the District of Columbia put the

matter succinctly in a case in which the defendant sought

pretrial <u>Daubert</u> hearings on the admissibility of all of the

government's proposed expert testimony, including that relating

to ballistics and fingerprints (the defendant did not specify in

what manner the testimony was alleged to be unreliable):

> Although the Court must ensure that expert testimony is
> reliable and admissible, there is nothing in Kuhmo Tire or
> Daubert that requires the Court to conduct a pre-trial
> evidentiary hearing if the expert testimony is based on
> well-established principles. . . . When a principle is well-
> established,the questions are simply whether the expert
> properly applied the established scientific principle to the
> facts and whether the expert's credibility is compromised
> for reasons such as bias.  These are matters that a jury
> usually is competent to evaluate after cross-examination and
> presentation of competing expert testimony.  Accordingly,
> where expert testimony is based on well-established science,
> the courts generally have concluded that reliability

problems go to weight, not admissibility.

United States v. Cooper, 91 F. Supp.2d 79(D.D.C. 2000) (quoting

Wright and Gold, Federal Practice and Procedure § 6266, at 265).

Se also United States v. Nichols, 169 F.3d 1255, 1262-1263 (10th

Cir. 1999) (affirming trial court's denial of a motion for a

Daubert hearing where the challenged evidence-- expert testimony

regarding chemical testing of an object recovered from the site

of the Oklahoma City federal building bombing-- did not involve

any new scientific theory and the testing methodologies employed

were well-known techniques routinely used by chemists).  Because

of the expert testimony challenged by the defendant does not

involve a novel scientific procedure, a Daubert hearings is both

unnecessary and inappropriate; Defendant's motion should be

denied.

A.    **EnCase forensic software is worthy of judicial notice of its reliability; EnCase is generally accepted, its principles and methods have ben tested and found reliable, it has been subject to peer review and publication and is heavily relied upon and used by both the government and private sector.**

1.    *EnCase's underlying principles and methods have general acceptance which appropriately lends to its reliability and therefore admissibility.*

As noted above, Daubert sets forth a non-exhaustive list of

factors for courts to consider in performing their gatekeeping

role for the introduction of expert testimony. One factor the

Court should consider is whether the software has "general

acceptance" within the "relevant scientific [or technical]

community."   It is readily apparent that EnCase is generally

accepted among law enforcement and legal communities as a

reliable and necessary forensic investigation tool.  EnCase is

used world-wide and is the leading tool for law enforcement

agencies at the local, state and federal level to conduct

forensic examinations of seized computers.  See Williford v.

State, 127 S.W.3d 309, 311 (Tex. App. 2004).   Both state and

federal courts have permitted testimony based upon evidence

retrieved and analyzed through the assistance of EnCase forensic

software.   Many courts, including  the District of

Massachusetts, have acknowledged the use of EnCase as a tool to

retrieve and analyze forensic evidence.[5]  See United States v.

Frabizio, 341 F.Supp.2d 47 (D. Mass 2004); United States v. Hill,

322 F.Supp.2d 1081 (C.D.Cal. 2004); United States v. Grimmett,

No. 04-40005-010-RDR, 2004 WL 3171788 (D.Kan. 2004); United

States v. Long, 425 F.3d 482 (7th Cir. 2005).[6]   In fact, the

---

[5] Cases in this District in which witnesses testified about
evidence obtained using EnCase include United States v.
Habershaw, 2001 WL 1867803 and as recently as a few weeks ago in
the trial of Martin VanVliet at Docket Number 02-10362.

[6] Other cases either challenging EnCase software of
involving EnCase software include: State v. Cook, 777 N.E.2d 882
(Ohio App. 2002), Taylor v. State, 93 S.W.3d 487 (Tex. App.
2002), People v. Rodriguez, Sonoma County, California Superior
Ct. no SCR28424 (EnCase was subject to a lengthy pretrial hearing
which established its validity and reliability), People v.
Merken, case no. 1815448 (Cal.Sup. Ct., San Francisco, May 1999),
State of Nebraska v. Nhouthakith, Case No. CR01-13, District

government could find no case in which the use of the Encase

software was not allowed. The widespread use of EnCase in the law

enforcement community as well as its acknowledged functionality

by the courts evidence its already well-accepted reliability

under Daubert.

2.    *EnCase's underlying principles and methods have been
      tested and found reliable and/or are commercially
      available for testing.*

Another factor the Court should consider is whether the

principles and methods have been tested and found reliable and/or

are commercially available for testing.  The EnCase forensic

software has been extensively tested. In 2003, it was tested by

the Computer Forensics Tool Testing project (CFTT). See National

Institute of Justice, Test Results for Disk Imaging Tools: EnCase

3.20 (2003) (hereinafter EnCase Test Results).  The result of

that test confirmed its reliability for use by law enforcement

---

Court of Johnson County, Nebraska, United States v. Greathouse,
297 F.Supp.2d 1264 (D.Or. 2003), State v. Anderson, 2004 WL
413273, People v. Donath, 2005 WL 850895 (Ill.App. 1 Dist. Apr.
13, 2005), State v. Levie, 695 N.W.2d 619, 624 (Minn. App. 2005),
State v. Luther, 105 P.3d 56, 58 (Wash. App. Div. 1 2005),
Liebert Corp. v. Mazure, 2005 WL 762954 (Ill, App. 1 Dist.,
2005), Porath v. State, 148 S.W.3d 402 (Tex. App.-Houston [14
Dist.], 2004), People v. Zavala, 2005 WL 605465 (Cal. App. 6
Dist. March 16, 2005), People v. Upton, 2004 WL 2075393 (Cal.App.
6 Dist. Sept. 17, 2004), State v. Howell, 609 S.E.2d 417, 419
(N.C.App. 2005), Fridell v. State, 2004 WL 2955227 (Tex. App. Dec
22, 2004), State v. McKinney, 699 N.W.2d 471, 2005 S.D. 73 (S.D.
2005), United State v. Bass, 411 F.3d 1198 (10th Cir. 2005),
United State v. Davis, 61 M.J. 530 (Army Ct. Crim. App. 2005),
United States v. Long, 425 F.3d 482, 484 (7th Cir. 2005), Foust
v. McFarland, 698 N.W.2d at 29.

13

and the courts. For example, the testing found 1) "Encase never altered the original hard drive;" (<u>Encase Test Results</u>, page 5) 2)"Encase always identified image files that had been modified;" (<u>Encase Test Results</u>, page 6) and 3)"Encase always logged I/O errors." (<u>Encase Test Results</u>, page 6). In fact, extensive testing performed on the Encase software resulted in only three potential anomalies, none of which pertain to this case. And, perhaps most importantly, it showed that even when those anomalies occurred, they were apparent. <u>EnCase Test Results</u> at 16-19.

Defendant's reliance on the exclusion of deleted file recovery cases from the CFTT test for support in obtaining a <u>Daubert</u> hearing on Encase is both misguided and misleading. As the report noted, these types of cases "are not ever used to test any disk imaging tools . . . because deleted file recovery tools will be tested separately." <u>Encase Test results</u>, page 11. In other words, the true test in deleted image cases is simply whether deleted images are accurately acquired by a software, something the CFTT has already confirmed. Some explanation and an example are illustrative here:

The Windows Operating System (OS) stores and keeps track of files on the computer employing what is referred to as the File Allocation Table (FAT). The FAT can be likened to a table of contents which refers the Operating System to the specific

location of a file on the hard drive when it is needed.  When a
new file is created on the hard drive, the OS copies the contents
of the file to an available sector on the hard drive and
simultaneously updates the table of contents with an entry for
the file and the specific physical location on the hard drive.

By the same token, when the user deletes a file, the OS
records this action by removing that entry from the table of
contents.  **The underlying data, however, is not removed.**
Physically the data still exists on the hard drive.
Conceptually, this is analogous to a librarian removing a card
from the card catalogue: the card is gone, but the book itself is
still on the shelf.  Without reference to that book in the card
catalogue, a person looking for that book may have to go through
every book in the library to find it.  While a herculean task,
this can be accomplished, and it's verified once the book is
found.

Likewise, when a file is deleted by the OS, the contents of
the file are still available to be read from the hard drive.
Encase, and the dozens of commercial tools like it, simply
automate the herculean task of manually looking through every
file on the hard drive.  This "file recovery function" of Encase
doesn't involve analysis or interpretation; it simply states what
data is available.  The value of the tool is that it can complete
this search and report on it exponentially faster than can a

human being.  Once it finds a "deleted" file, the tool simply points the examiner to the location of the file.  The examiner does the actual analysis of the file with respect to the facts of the case.

Defendant's argument that CFTT did not conduct a test on this particular occasion and therefore Encase is invalid misses the point.  The only relevant test for <u>this case</u> is in the acquisition process (are both active and deleted files copied to the evidence image).  This process <u>was</u> in fact tested and, as noted above, Encase accurately copied the entire original (deleted and non-deleted) in every instance. <u>Encase Test Results</u>, page 5.  In addition, as with the library example above, further validation of Encase's reliability in retrieving deleted files is readily available: When Encase reports that a deleted file is found at Location A, the forensic examiner need only look directly at Location A to see that file does in fact exist.

Encase is commercially available to the public and can be tested by anyone.  Despite this, defense counsel has provided, and the government could find, no case declining to accept testimony based on the use of Encase software.

3.  *EnCase's operation standards respond to a known rate of error and provide reliability in accordance the standards outlined in <u>Daubert</u>.*

<u>Daubert</u> also suggests the court take note of the known rate

of error and the existence and maintenance of standards

controlling the technique's operation.  Daubert, 509 U.S. at 594.

As shown in the report provided by Defendant, extensive testing

of Encase has found only three anomalies with the EnCase

software: a BIOS anomaly, a logical restore anomaly and a restore

anomaly.  EnCase Test Results at 6.  Defendant relies on these

anomalies to support his argument that EnCase is not reliable,

failing to recognize that Daubert does not require perfection in

science; it requires only that errors be recognizable and that

standards exist.  Daubert does, however, look to relevance.

Defendant has not shown, and indeed can not show, that any of the

anomalies he relies upon in his request for a Daubert hearing are

relevant to the case before the Court.  Briefly, the first

anomaly concerned the fact that Encase ignores entirely a small

piece of a hard drive that is "not...used on a system with a

legacy BIOS for any purpose by Microsoft operating systems or by

typical application programs."  Encase Test Report, Page 7.

However, the piece could be used by other operating systems like

Linux or UNIX. In other words, Encase doesn't copy an empty piece

of the hard-drive that Microsoft doesn't even use.  Since

Defendant's operating system was Microsoft, and not Linux or

UNIX, this anomaly is irrelevant to his case.  The second

anomaly, the "restore size anomaly," applies only to "the Windows

2000 environment." Encase Test Report, Page 6.  Since Defendant

utilized Windows 98, this anomaly is equally irrelevant to his

case.  Finally, the third anomaly relied upon by Defendant, the

"logical restore anomaly," applied to such a minute piece of the

computer that "in no case was there any effect on sectors used in

data files.  All sectors of the image file [the copy] accurately

reflected the original sectors."  Thus, the report concluded that

this "anomaly" had absolutely no effect on any actual data, and

in fact was found only to be of possible consequence to the

"Windows shutdown process."  Encase Test Report, Page 6.

Daubert and Kumho Tire squarely address Defendant's concerns

by relegating them to the appropriate arena of cross-examination.

Nothing Defendant has raised supports the necessity for a Daubert

hearing on what is clearly a long standing well-established

method of law enforcement investigation.

4.    *Encase forensic software has been subject to peer
      review and the subject of publications supporting its
      overall reliability.*

EnCase forensic software has been the subject of many

publications and peer review.  The most compelling peer review is

the 2003 CFTT project, discussed here.  Encase Test Results.  The

CFTT test was performed by some of the organizations who have

relied extensively on its application, namely the United States

Department of Justice and Department of Defense, and therefore

meet the peer review standard.  Id. at 4.  Additionally, EnCase

has been subject to publication and peer review in various print

media receiving high ratings. For example, <u>See</u>, Jon Tullett,
<u>EnCase Forensic</u>, SC Magazine, Jul. 2005, ("Overall, we can find
no fault with EnCase. Previous versions have performed solidly,
and version 5.0 is a worthy upgrade"), CRN, <u>Encasing Your
Valuable Files For Investigation Purposes</u>, ChannelWEB, Jun. 2005,
(reporting on tests and reviews by AppleTech CEO Darrel Bowman
and Jody Randall, an instructor for the National Security Agency-
certified Computer Information Systems Security program), Mary
Kathleen Flynn, <u>Computer Crime Scenes</u>, PC Magazine, Feb. 2002.
Examples of other publications involving the widespread use and
reliability of EnCase are being filed with this Court and are
hereby incorporated by reference as Exhibits 1-8.

**<u>CONCLUSION</u>**

As federal and state courts have found for years, EnCase
meets the reliability requirements established in <u>Daubert</u> and
hence the Federal Rules of Evidence, Rule 702.  EnCase has been
subject to extensive testing, has received extensive peer review
and publication and is generally accepted as a valid and reliable
forensic tool.  EnCase is so widely used and accepted that it
deserves judicial notice of its reliability and therefore
admissibility.  Any issues Defendant has with this well accepted
piece of software can be adequately addressed through cross-
examination.  Defendant has provided absolutely no evidence that

a <u>Daubert</u> hearing in this case is warranted or appropriate.  For
the foregoing reasons, Defendant's request for Daubert hearing on
Encase should be denied, and expert witness testimony about
EnCase and testimony based on evidence obtained through the use
of EnCase should be admitted at Defendant's trial.

                              Respectfully submitted,
                              MICHAEL SULLIVAN
                              United States Attorney

                              <u>/s/ Dana Gershengorn</u>
                              DANA GERSHENGORN
                              Assistant United States Attorney
                              617-748-3120
                              SHERRI A. STEPHAN
                              Trial Attorney
                              U.S. Department of Justice
                              202-353-4438

Dated: March 3, 2006