UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

```
_____
                              )
UNITED STATES OF AMERICA      )
                              )    CASE NO. 04CR10217GAO
v.                            )
                              )
DARREN F. WILDER              )
_____ )
```

REPLY MEMORANDUM RE: ADMISSIBILITY
OF EXPERT TESTIMONY OF THOMAS MUSHENO

      The Defendant, Darren Wilder, submits this memorandum in response to the Government's Opposition to Defendant's Motion to Preclude Testimony of Government Witnesses to address the admissibility of the proffered testimony of Thomas Musheno[1]. For the reasons stated below, Mr. Musheno*s testimony should be excluded in its entirety.

      The framework for analyzing the admissibility of Mr. Musheno*s testimony is set forth in Daubert v. Merrell Dow Pharmaceutical, 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), and Fed. R. Evid. 104, 702, and 703.

      Fed. R. Evid. 104(a) provides:

> Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]

      Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact

---

[1] Mr. Musheno's proffered testimony was the subject of a multi-day Daubert hearing in United States v. Frabizio, Docket No. 03-102 pending before Judge Gertner. This pleading is substantially taken from defense counsel's pleadings in Frabizio.

>to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, expertise, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The factors listed in the Rule include some of those cited in Daubert as relevant to the inquiry. The nonexciusive list of factors in Daubert include: 1) whether the expert*s technique or theory can be or has been tested; 2) whether the technique or theory has been subject to peer review and publication; 3) the known or potential error rate; 4) the existence and maintenance of standards and controls; and 5) whether the technique has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. Kumho Tire, in turn, applied the same approach to non—scientific expert testimony. The amended version of Rule 702 specifically

>rejects the premise that an expert*s testimony should be treated more permissively simply because it is outside the realm of science. An opinion from an expert who is not a scientist should receive the same degree of scrutiny for reliability as an opinion from an expert who purports to be a scientist. . . . The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted.

Advisory Committee Notes to 2000 Amendment to Fed. R. Evid. 702.

The Advisory Committee Notes urge that, if the witness is relying solely or primarily on experience,"

>the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court*s gatekeeping function requires more than simply "taking the expert*s word for it." [citing Daubert] The more subjective and controversial the expert*s inquiry, the more likely the testimony should be excluded as unreliable.
>Id.

It is respectfully submitted that Mr. Musheno*s testimony fails to meet these standards.

As a preliminary matter, it is essential to properly define the "technique or theory" that is subject to this analysis. Based upon Mr. Musheno's testimony in the Frabizio case, he is expected to testify that he has, for years, performed various forms of "image analysis." 5/5: 7-9[2]. These include many techniques that are not relevant to the testimony the government has proffered in this case. This is not a case in which Mr. Musheno is being asked to compare two images to determine if they are the same person, nor is he being asked to determine the height of a person depicted in a photograph. Instead, his testimony is confined to the area of image authentication, determining whether a given image is real or not.

    I.    THE TESTIMONY REGARDING IMAGE AUTHENTICATION DOES NOT MEET THE DAUBERT AND KUMHO TIRE TESTS.

Turning to the Daubert factors, then, the image authentication analysis performed by Mr. Musheno in this case falls short on all of the factors.

First, Mr. Musheno's technique has not been tested. 5/6: 64-67.  While it conceivably could be, no such tests have been conducted.

Second, the technique has not been subjected to peer review and publication. While Mr. Musheno referred several times to "peer review" of his conclusions and reports, it appears that this review is not independent and is nothing more than a rubber stamp. 5/6: 16, 30. Mr. Musheno testified that the person conducting the so—called peer review is aware of his conclusions, and that no such review ever has disagreed with his conclusion that an image is real. Id. 5/6: 121-122.

---

[2]For convenience and uniformity the page citations to Mr. Musheno's testimony in Frabizio are included here in as "date:page".

Third, because there is no testing and because, as Mr. Musheno essentially conceded, there is no way of knowing the "correct" result, the error rate is unknown.

Fourth, although the unit in which Mr. Musheno works uses a standardized form, it is apparent that the form has been compiled collaboratively, is evolving, and never has been the subject of any outside independent review. 5/5: 26, 5/6: 92-93, 5/6: 98-99. The form simply lists characteristics that someone thought might be important, with no rationale underlying the inclusion of any of them. Furthermore, there are no standards even <u>within</u> the unit for the number or type of factors that determine whether an image is real or not. 5/11: 35. Unlike fingerprint analysis, which requires a certain number of points of comparison, no such threshold is set. 5/6: 96-97. Mr. Musheno testified, "[T]he problem is you can*t quantify this type of examination." 5/6: 96.  He agreed that it was subjective, or at least "qualitative." 5/6: 96. The FBI has no criteria for determining when an image is too degraded to be reliably analyzed. 5/11: 49.

This lack of standards or criteria extended to the conclusions drawn from multiple images. The FBI unit had no guidelines requiring a certain number of images before an image could be declared "real." 5/6: 97. Moreover, Mr. Musheno testified that, when he compared the images in this case to other images that appeared to depict the same people, he did not use the FBI*s form to analyze the other images, 5/6: 120, nor did he look at forms prepared by other examiners for those images, 5/11:18.

Instead, Mr. Musheno testified that he would conclude that an image is not real "[i]f an image looks cartoonish." 5/6: 22. He went on to explain that, "it*s all image specific. . . . if there were something so gross, if the perspectives were so out of whack[.]" Id. After Mr. Musheno mentioned that one of the factors would be an inconsistency in the quality of the light, he

clarified that he would not necessarily conclude that an image was not real if it had inconsistencies: "it depends on the image you're looking at." 5/6: 22.

Finally, there Is no evidence that this technique has been accepted in the scientific or relevant technical community. This technique seems to be entirely the product of a group of FBI employees, reviewing each other's work. See N. Saks, "Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science," 49 Hastings L.J. 1069, 1092 (April 1998); cf. United States v. Hines, 55 F.Supp.2d 62, 67 (D.Mass. 1999) (noting existence of areas of specialized knowledge "invented and legitimized only by those within [them], that then dissolved when tested by independent standards")

While many forensic sciences have been challenged since Daubert, those that have withstood the challenge featured more rigor and more venerability than the expertise proffered here. Cf. United States v. Crisp, 324 F.3d 261, 270 (4th Cir. 2003) (rejecting Daubert challenges to handwriting and fingerprint evidence, citing, inter alia, testing and proficiency requirement and uniform standards)

Mr. Musheno testified that the examinations "relating to determining if a child is real or if there have been manipulations, probably [began in the] mid to late 90s." 5/5: 15.[3] On cross-examination, however, he said that the type of examination at issue in this case began in the late l990s, but was "less frequent in the late '90s than they are now." 6/7: 86-87. He had testified in only five trials regarding this area. 5/5: 16-17. Only one Daubert hearing had been held regarding his testimony in this field.

---

[3] It was not clear if Mr. Musheno was discussing the type of analysis performed in this case, since he described three different techniques used in child pornography cases

While one might debate at length the weight that the venerability of a technique should be accorded, see Crisp, 324 F.3d at 272-73 (Michael, J., dissenting), it is clear that the one at issue in this case lacks the general acceptance that fingerprints and handwriting analysis have gained. Cf. id. at 268, 271 (citing "long history of admissibility" of fingerprint and handwriting evidence); United States v. Hines, 55 F.Supp.2d at 67 (citing Court's unwillingness to exclude, on less than full record, "decades of 'generally accepted' testimony").

The evidence proffered here also differs in one significant aspect from the areas of fingerprinting and handwriting: those fields involve the comparison of a "known" sample with a "questioned" document or item. The differences and similarities can be viewed by the jury and evaluated independently. Here, in contrast, the images that Mr. Musheno examined are analyzed in a vacuum. There is no comparative sample that the jury can view, no example of a "real" image to be compared to a "questioned" image. See Hines, 55 F.Supp.2d at 70 (noting that handwriting expert can be cross-examined about significance of differenes and similarities in handwriting) . The comparison of the images found on Mr. Frabizio's computer to others alleged to be part of the same series is not analogous, because the similarities or differences between them do not, in and of themselves, demonstrate how "real" they are.

Even apart from the Daubert factors, the reliability of this technique is suspect, at least as applied to this case. First, Mr. Musheno acknowledged that he is "not a computer examiner," 5/6: 127, nor a computer artist. 5/6:54, 67,79, 116. He never had visited websites that post galleries of computer generated art. 5/11: 20-21. His training in Photoshop was outdated,[4] 5/6: 61; his use of

---

[4] Mr. Musheno testified that most of the changes in Photoshop involved web design techniques. On cross-examination, however he acknowledged that, in approximately 2002, Photoshop 7 added a tool called "Healing Brush," which is similar to airbrushing and not specifically related to web design. 5/11:

it was confined to older versions, 5/6: 74, 5/11:5; and his knowledge of other forms of computer graphics software was limited. 5/6: 43, 45, 80.

The reliability of the analysis of the images in question here is undermined by the nature of the images and the lack of background information regarding them. Mr. Musheno acknowledged that all of the images were in JPEG format and all six had text added. This meant that they had been compressed, resulting in the loss of information. 5/6: 102-104. Some of the artifacts of manipulation might be discarded in the process. 5/6: 103. Mr. Musheno could not tell how many times the image had been compressed, or when. 5/6: 106, 114. He could not tell how the text had been aded. 5/11: 39. Each time an image was opened and saved as a JPEG, more information would be lost. 5/6: 106. The process of adding text is another form of manipulation that, when combined with compression, results in the loss of even more information. 5/6: 105-106.

While some of these flaws in his analysis could be characterized as fodder for cross-examination, that suggestion ignores the highly technical nature of these weaknesses, as well as the fact that <u>Daubert</u> and <u>Kumho</u>, as well as Rule 702, require a focus on the reliability of the application of the methodology in question. As the <u>Kumho Tire</u> Court noted,

> the specific issue before the court was not the reasonableness *in general* of a tire expert's use of a visual and tactile inspection to determine whether overdeflection had caused the tire's tread to separate from its steel-belted carcass. Rather, it was the reasonableness of using such an approach, along with Carlson~s particular method of analyzing the data thereby obtained, to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant* [ .]

<u>Kumho Tire</u>, 526 U.S. at 154 (emphasis in original). Mr. Musheno*s testimony also is unreliable

---

6. Furthermore, he was not aware that a new version of Photoshop had just been released. 5/11: 5. See "A New Photoshop Makes Retouching Reality (Somewhat) Easier, <u>New York Times</u>, May 5, 2005.

because it is based on a key burden-shifting assumption. While he testified that it is possible to create or manipulate images in a way that cannot be detected, he also testified, "[T]o my knowledge nobody has ever basically created the perfect fake and after fooled everybody, they came and said look what I did. It*s my understanding that does not exist." 5/6:63. This unproved presumption underlies his entire testimony.

Mr. Musheno testified that he would never find a single still image to be real. But the basis for his conclusion that a series of images was real was not adequately supported. He testified that he is "aware of how incredibly difficult it is to either manipulate or generate one image alone. If you start to have multiples, then that difficulty increases." 5/6: 25. His "awareness," however, comes from conversations with experts in the field, not from his own expertise. Moreover, it appears that this conclusion is based on the assumption that the computer artist started with a single image or single pose. Mr. Musheno testified that one could easily manipulate an image to create a slightly different pose, but much more difficult "where a body is effectively moved in three dimensions[.]" 5/6: 28. This premise, which seems essential to the conclusion at issue here, does not contemplate the possibility that an adult could be photographed in multiple, varied poses and that the artist could alter those images to make the person appear younger.

The proffered opinion bears similarities to the expert testimony rejected in Kumbo Tire. In that case, the district court had excluded evidence of a visual inspection of an allegedly defective tire, concluding, that there were "insufficient indications of the reliability of 'the component of Carlson*s tire failure analysis which most concerned the Court, namely, the methodology employed by the expert in analyzing the data obtained in the visual inspection, and

the scientific basis, if any, for such an analysis.*Id. at 6c." Kumho Tire, 526 U.S. at 146.

      II.      MR. MUSHENO*S TESTIMONY THAT A PARTICULAR IMAGE IS REAL SHOULD BE EXCLUDED BECAUSE IT IS BASED ON HEARSAY EVIDENCE THAT IS NOT OF A TYPE RELIED UPON IN THE FIELD.

Mr. Musheno testified that he never would conclude that a single still image was real, but might conclude (as he did in this case) that multiple images appearing to depict the same individual are real. This conclusion, in turn, was based on information gathered by interviewing individuals in the fields of computer graphics, advertising, and related industries about "what the latest and the greatest is when it comes to manipulating imagery or creating imagery." 5/6: 60. Mr. Musheno testified that he could not conclude that the images in question are real "unless I considered [what] the experts in the industry [said] ." 5/6: 118.[5]

This testimony violates the Confrontation Clause. See Note, "Testimonial Hearsay as the Basis for Expert Opinion: The Intersection of the Confrontation Clause and Federal Rule of Evidence 703 after Crawford v. Washington," 55 Hastings L.J. 1539 (June 2004) . "A potential confrontation problem arises . . . if a jury accepts testimonial hearsay — presented either under Rule 703 to assist in evaluating the expert*s opinion or through an expert 'opinion* which essentially consists of recitation of hearsay — for its truth." Id. at 1555.

After Crawford v. Washington, 124 S.Ct. 1354, 1357 (2004), eliminated the touchstone of reliability from Confrontation Clause analysis, the Eleventh Circuit, in an unpublished opinion

---

[5]Mr. Musheno was unable to cite a single article regarding the "current capability of technology to create a realistic looking computer-generated [still] image." 5/6: 81-82. With respect to the difficulty of rendering a realistic naked human body through computer-generated imagery, Mr. Musheno said, "I*m not an artist but just again dealing with the people within the industry who do manipulation or do generation or do creation of individuals, it*s incredibly hard." 5/6:67.

held that an agent's expert testimony about drug value, based on information from a declarant who was neither unavailable nor subject to cross-examination, violated the Confrontation Clause. United States v. Buonsignore, 2005 U.S. App. LEXIS 8898 (11th Cir. May 13, 2005). In doing so, the Eleventh Circuit effectively overruled its pre-Crawford decision in United States v. Brown, 299 F.3d 1252 (11th Cir. 2002), vacated on other grounds, 538 U.S. 1010 (2003), reinstated by 342 F.3d 1245, 1246 (11th Cir. 2003) (holding that DEA agent's testimony regarding drug value was based in part on testimony conveyed by another agent, who in turn had spoken to foreign authorities)

In a pre-Crawford case, the First Circuit held that an ATF agent's reliance in part on information provided by gun manufacturers for his opinion regarding the interstate nexus of a firearm did not render his opinion inadmissible. United States v. Corey, 207 F.3d 84 (1st Cir. 2000). Significantly, the First Circuit noted, "[W]e need not consider whether the Cooney testimony would have been inadmissible under [Fed. R. Evid.] 703 had he relied exclusively on the telephone conversation to Smith and Wesson employees." Id. at 91.

In dissent, Judge Torruella asserted, "If this Court is willing to allow a government agency to rely on its own internal manuals and post-indictment telephone calls to establish a basic element of a crime, simply by clothing the testifying agent with the unwarranted aura of "expert," then, in my opinion, the plain language of the Confrontation Clause has been emasculated beyond recognition." Id. at 105.

The ultimate opinion, which is completely dependent on telephone interviews is, in the instant case, being used to establish an element of the crime charged: whether the images are real. Moreover, Mr. Musheno's testimony amounts to repetition of the opinion of another, out-of-

court declarant, not subject to cross-examination. As in <u>United States v. Dukagjini</u>, 326 F.3d 45 (2nd Cir. 2002), where the Second Circuit held inadmissible an agent*s testimony about drug code words:

> [I]n this case the expert was repeating hearsay evidence without applying any expertise whatsoever, thereby enabling the government to circumvent the rules prohibiting hearsay. The government argues that the appellants had an opportunity to cross-examine Biggs, but that, of course, is no answer when it is the out-of—court declaration of another, not subject to cross-examination, that is being put before the jury for the truth of the matter asserted.

<u>Id</u>. at 59.

The fact that Fed. R. Evid. 703 prohibits the government from disclosing to the jury the otherwise inadmissible information that its expert relied upon does not resolve the Confrontation Clause issue. In order to properly cross-examine the witness, defense counsel must inquire into the bases of the witness* opinion. Reliance upon the opinion provided by another effectively precludes effective cross-examination.

Fed. R. Evid. 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." The constitutionality of the rule and the scope of its applicability are questionable, in the wake of <u>Crawford</u>.[6]

But even apart from the Confrontation Clause, we submit that Mr. Musheno*s reliance on interviews with people in the digital arts field does not fall within Rule 703. The Rule is intended to permit experts to rely upon <u>data</u> presented to, and presumably analyzed by, them. See

---

[6]The Advisory Committee Notes suggest that the Rule is designed to permit only reliable hearsay to form a basis for an expert opinion. This suggests, in turn, that the Rule was based on a view of the Confrontation Clause that was overruled in <u>Crawford</u>.

-11-

Advisory Committee Note to Rule 702. The example given in the Advisory Committee Notes is that of a physician, relying upon "information from numerous sources and of considerable variety" to make a diagnosis, including test results, other hospital records, and statements by patients and relatives. Id. Here, Mr. Musheno is simply repeating someone else's opinion regarding the current state of the technology, not relying upon the type of data that experts in his field accumulate and digest.

The issue of whether the information is of the type reasonably relied upon by experts in the field is a threshold issue, to be decided by the trial judge. See Fed. R. Evid. 104. The government attempted to establish that Mr. Musheno's testimony met the requirements of Rule 703 by eliciting testimony that Mr. Musheno's unit, as a whole, relies "on information obtained regarding the state of the art in industry from people in the movie and advertising industries[.]" 5/11: 27. But that fact only reinforces the conclusion that the "expertise" is one invented by — and confined to — a few people employed by the Federal Bureau of Investigation who validate each other's work, without any real outside rigor or critique. See M. Saks, "Merlin and Solomon: Lessons from the Law's Formative Encounters with Forensic Identification Science," 49 Hastings L.J. 1069, 1092 (April 1998) ("Because of its institutional position within the legal system, the forensic identification sciences have taken on a shape that resembles no other science.").[7]

III.   TESTIMONY THAT THE IMAGES "APPEAR TO BE REAL" SHOULD BE

---

[7] Professor Saks enumerates the ways in which forensic sciences, by virtue of their alliance with the prosecution, differ from other sciences: they are closed to outside scrutiny, do little research or publication, are tainted by a "confirmatory bias", and tested in secret. "It is ironic that while studies of the effectiveness and accuracy of so many professional enterprises are available in published literate, the same is not true of a field whose sole purpose is to do some of the public's most public business." Id. at 1094.

EXCLUDED UNDER FED. R. EVID. 401, 402, and 403.

Throughout his testimony, Mr. Musheno referred to his examination as focusing on whether certain features "appear to be real or . . . appear to be cartoonish." 5/6:10. See also 5/5:11.[8] Evidence that an image appears to be real is relevant only if the fact that something appears to be real makes it more likely that it is real. See Fed. R. Evid. 401, 402. But just because something appears to be real does not mean that it is real. As Mr. Musheno acknowledged, "[I]t is possible to create imagery or to manipulate imagery that*s undetectable[.]" 5/6: 23. Thus, something artificial can appear to be real.

In order to transform testimony that the images "appear to be real" into relevant testimony, the government would need to lay a foundation that is missing here: that images that appear to be real are more likely to be real. The only basis for that inference in this case is the out-of-court information cited by Mr. Musheno, admission of which violates the Confrontation Clause.

Even if the government could present admissible evidence that it is "incredibly difficult" to create undetectable virtual images of people, Fed. R. Evid. 403 would bar the admission of that evidence, as well as the "appears to be real" testimony. Such evidence would invite speculation: How difficult is "incredibly" difficult? How many people have the skills to accomplish it? Would it cost millions of dollars, or only thousands?

Even if the evidence that the images appear to be real could be found to carry some slight probative value, that relevance would be greatly outweighed by the risk of prejudice and jury

---

[8]He later acknowledged that "cartoonish" was "maybe . . not the proper term." 5/6: 23. Instead, he said, "dealing with the actual artifacts or <u>any number of these things listed</u> might indicate that it is not real[.]" 5/6: 23 (emphasis added).

confusion. See Fed. R. Evid. 403. The evidence likely would serve to confirm the jury's lay impression that images that appear to be real are real, despite the absence of scientific support for that proposition. "[A] certain patina attaches to an expert's testimony unlike any other witness; this is 'science,' a professional's judgment, the jury may think, and give more credence to the testimony than it may deserve." <u>Hines</u>, 55 F.Supp.2d at 64. See also <u>United States v. Montas</u>, 41 F.3d 775, 784 (1st Cir. 1994)

For similar reasons, Mr. Musheno's testimony about the absence of "artifacts" of manipulation or computer generation should be eliminated. First, this lends a scientific sheen to what is essentially testimony that the images appear to be real. Second, to the extent that this evidence includes testimony about the absence of anomalies or distortions, it carries the danger of shifting the burden to the defendant of showing that the images are not real. The Supreme Court has rejected this approach. <u>Free Speech Coalition v. Ashcroft</u>, 535 U.S. 234, 255—56 (2002)

The risk of prejudice and confusion is heightened in this case, because testimony that the images "appear to be real" bring them into an area that the First Amendment protects. In <u>Free Speech Coalition v. Ashcroft</u>, 535 U.S. 234 (2002), the Supreme Court held that the portion of the child pornography statute prohibiting images that "appear to be" children engaging in sexually explicit conduct violated the First Amendment.

V.  THE IMPACT OP EXCLUSION ON THE GOVERNMENT'S CASE SHOULD NOT BE A FACTOR.

The government has asserted that exclusion of the proffered testimony would make it very difficult for the government to prove that the images are real and, therefore, for the

government to successfully prosecute child pornography cases. See, e.g., United States*

Opposition to Defendant*s Motion for Daubert Hearing at 13. This precise argument was made to

the Supreme Court in Free Speech Coalition v. Ashcroft, 535 U.S. 234, 254—56 (2002) . The

Supreme Court rejected that argument.

> Finally, the Government says that the possibility of producing images by using computer imaging makes it very difficult for it to prosecute those who produce pornography by using real children. <u>Experts, we are told, may have difficulty in saying whether the pictures were made by using real children or by using computer imaging</u>. The necessary solution, the argument runs, is to prohibit both kinds of images. The argument, in essence, is that protected speech may be banned as a means to ban unprotected speech. This analysis turns the First Amendment upside down. The Government may not suppress lawful speech as the means to suppress unlawful speech. Protected speech does not become unprotected merely because it resembles the latter. The Constitution requires the reverse.

Id. at 254-255 (emphasis added)

For the same reasons, the government should not be permitted to win convictions by

relying on unreliable, unproven, and untested techniques that violate the defendant*s rights to

confront witnesses and to a fair trial. Mr. Musheno*s testimony should be excluded.

            Respectfully submitted,

            Peter Charles Horstmann, Esquire
            BBO #556377
            PARTRIDGE, ANKNER & HORSTMANN, LLP
            200 Berkeley Street, 16th Floor
            Boston, Massachusetts 02116
            (617) 859-9999

## CERTIFICATE OF SERVICE

  I, Peter Charles Horstmann, Esquire, hereby certify that on this 8th day of March, 2006, a copy of the foregoing REPLY MEMORANDUM RE: ADMISSIBILITY OF TESTIMONY OF THOMAS MUSHENO was served electronically upon Dana Gershengorn, Assistant United States Attorney, United States Attorneys Office, One Courthouse Way, Boston, MA 02210 and upon Sherri A. Stephan, US Department of Justice, Child Exploitation and Obscenity Section, 1400 New York Avenue NW, 6th Floor, Washington, DC 20005

            Peter Charles Horstmann, Esquire